# EXHIBIT D

```
 1                UNITED STATES DISTRICT COURT
                  CENTRAL DISTRICT OF CALIFORNIA
 2                     WESTERN DIVISION
                  CASE NO. 2:22-CV-02025 MWF (JPR)
 3

 4

 5    HUI CAL, et al,

 6            Plaintiffs,

 7    vs.

 8    CMB EXPORT LLC,

 9            Defendant.

10

11

12

13                ZOOM VIDEO DEPOSITION

                          OF
14
                  NIGEL BERNARD PATTERSON
15

16

17

                  Friday - January 12, 2024
18                 10:03 A.M. -  5:50 P.M.
                   Zoom Video Conference
19

20

21

22             Stenographically Reported By:

23                MARSHA C. BRANNON

24

25
```

Nigel Patterson
January 12, 2024                                        178

```
 1        A.   I don't really understand the mechanics of
 2   this.
 3        Q.   Okay.  So, I mean, do you know when these
 4   accountants use the phrase allowance for loan loss,
 5   do you have an understanding of what that means?
 6        A.   Yes, I do.
 7        Q.   What is your understanding?
 8        A.   It's right -- Well, I can't articulate it.
 9        Q.   Okay.  And is there any indication that
10   CMB could still pursue collection activities against
11   BrightSource?
12        A.   I'm sorry.  Is there any indication they
13   can still pursue it?  Is that what you said?
14        Q.   Yes.
15        A.   I wouldn't have a clue what they can or
16   cannot do anymore.
17        Q.   So, when you say that it's written off,
18   does that mean that you can't collect on it?
19        A.   What it means it shows in my partnership
20   account balance a write off of the full amount.
21        Q.   Isn't it true, Mr. Patterson, that, in
22   fact, the partnership has collected money after
23   December 31, 2016 from BrightSource?
24        A.   That's my understanding.  Where is it?
25        Q.   So, the fact that there's an allowance for
```

1    loan loss reflected in the balance sheet December

2    31, 2016, how has that harmed you?

3                 MR. GAW:   Objection, calls for a

4    legal conclusion.

5         A.    Could you rephrase that question, please?

6         Q.    I'll try.

7                 The fact that there's a allowance for a

8    loan loss reflected in the December 31, 2016 balance

9    sheet, how has that caused you any financial harm?

10        A.    Well, for starters it would have been in

11   the 2018, in both delivery of the financial

12   statements and also in the partner's capital account

13   balance as the last quarter of 2018.  The partner's

14   capital account balance also showed us that the

15   distributions have gone up and it also shows our

16   account balances going down every quarter.

17                That in my book harmed me.

18        Q.    So, the designation allowance for loan

19   loss has caused you harm because distributions

20   haven't been made.  Am I accurately stating your

21   position?

22        A.    Well, distributions haven't been made and

23   we have been advised that it's been written down,

24   which my interpretation is we don't expect

25   distribution to be made because they haven't told us

1    otherwise.

2        Q.   And, again, the fact that it's written

3    off, what does that mean to you as a practical

4    matter?  Does that mean you're never going to see

5    that money?

6        A.   That means the principle value has

7    disappeared, but I can still see a return at all at

8    the sole discretion of CMB and the various side

9    deals.

10       Q.   Are you familiar, Mr. Patterson, with the

11   fact that the general partner negotiated to obtain

12   an economic interest 12.4 percent of the solar

13   generating plant?

14       A.   Yes, I am.

15            MR. GAW:  Objection, lacks

16   foundation.

17       A.   It was reported somewhere.

18       Q.   And that was a asset that the partnership

19   did not have when it was entered into it; correct?

20       A.   That was correct.

21       Q.   So, if the plant is fully functional, as

22   you claim, and it's able to spine off sufficient

23   revenue and profit, then Group VII would be able to

24   share it; correct?

25       A.   I would fully expect them to share it.

Nigel Patterson
January 12, 2024                                                                181

```
1    That has not been happening so far.
2         Q.   Do you have an accountant, Mr. Patterson?
3         A.   Do I have a personal accountant?
4         Q.   Yes.
5         A.   As the family we have an accountant.
6         Q.   Who does -- who does your tax returns?
7              MR. GAW:  Sorry.  I'm getting a lot
8    of feed back from it sounds like someone's in a car.
9         A.   We have an accountant, yes.
10        Q.   So, the next question was:  Who does your
11   tax return?
12        A.   We have an accountant.  He's in California
13   somewhere.  I don't who it is.
14        Q.   Have you had any discussions with your
15   accountant regarding the partnership?
16        A.   Yes.  I believe my husband has and he's
17   trying to get on time financials so we can use them
18   as capital losses timely.
19             MR. JOYCE:  Gary, can you pull up the
20   responses to interrogatories number three in the
21   folder?  It's titled Plaintiff Nigel Patterson's
22   response to Defendant CMB Export LLC's first set of
23   interrogatories?
24        Q.   That's a 20 page document.  Do you
25   recognize that?
```

Nigel Patterson
January 12, 2024                                              187

1    There's a document here which has distributions on

2    it on a quarterly basis and there's nothing after --

3    Well, what we're looking at, this file.  There's one

4    on the 31st of March of 2017.  That's in March,

5    yeah.  That's it, yeah.  Okay.  So, that's where it

6    ends.

7         Q.   Okay.  So, just going back to this $91

8    million loan, it doesn't appear that it prevents you

9    from receiving distributions.

10             Would you agree with that?

11        A.   No.

12        Q.   You would agree or no?

13        A.   No, I don't agree with you.

14        Q.   Why?

15        A.   Because that was the last distribution on

16   the 31st of March of 2017.  Thereafter it's zero.

17   There is no indication it's not going to be zero

18   thereafter.

19        Q.   The loan loss allowance was made as of the

20   end of 2016.  You still took distribution in 2017;

21   right?

22        A.   That was the end.  Yeah, that was the end.

23   So, many years ago.

24        Q.   Let's go back to your -- let's see --

25   interrogatory responses.

Nigel Patterson
January 12, 2024                                                    188

 1                    MR. JOYCE:  Is that Exhibit 40, Gary?

 2                    THE REPORTER:  It's 43.

 3                    MR. JOYCE:  Okay.  Thanks.

 4          Q.   Can you to interrogator number 18 page 17?

 5     Just read it to yourself where it says interrogatory

 6     number 18, that question.

 7          A.   I'm sorry.  Which one am I reading?  What

 8     line number?

 9          Q.   Line number 10, identify all tax

10     consequences --

11          A.   Okay.

12          Q.   And then the response underneath, if

13     you'll read that to yourself.

14          A.   Uh-huh.

15          Q.   Okay.  Is it your position that you

16     suffered some adverse tax consequence as a result of

17     your participation in Group VII and the acts of CMB?

18                    MR. GAW:  Mr. Patterson, before you

19     answer I'll just note for the record that Plaintiffs

20     have offered to stipulate and will be moving for

21     leave to amend their complaint, if the stipulation

22     is not granted, that they're dropping all

23     allegations relating to adverse consequences in this

24     lawsuit.

25                    You can go ahead and answer, Mr.

Nigel Patterson
January 12, 2024                                                     189

 1   Patterson.

 2       A.   My answer is that this is (inaudible) to

 3   me.  So, I don't know.  I don't get involved in this

 4   stuff.

 5       Q.   So, as far as you know, as we sit here

 6   today, you don't know whether or not you suffered

 7   any adverse tax consequence by virtue of any acts or

 8   omissions of CMB?

 9       A.   I will have to defer that to my partner

10   who handles those issues.  I cannot say what they

11   are.  I have to get the information from him.

12       Q.   Mr. Patterson, do you have any

13   understanding of how much money the general partner

14   has lost in --

15              MR. GAW:  Objection.

16       Q.   -- Group VII?

17              MR. GAW:  Objection, lacks

18   foundation.

19       A.   That information I don't think has been

20   made available to us.

21       Q.   Wouldn't it show up in the financials?

22       A.   I don't know.

23       Q.   The answers to interrogatories number

24   five, it's on page five.

25              So, I know you've already testified that

Nigel Patterson
January 12, 2024                                                    190

1    you didn't provide these answer.  So, I'm just going

2    to read the question.  It says:  Describe in detail

3    all instances including dates of the first

4    occurrence where the Defendant failed to act

5    prudently, in good faith or in the best interest of

6    the partnership.  Right?  And there's a response

7    that -- and I'm looking at part of the response page

8    six, scroll down, scroll down, beginning on line 12,

9    it says:  On August 18, 2016 Defendant issued the

10   audit report for the period ending 7-31-2014.

11   Defendant stated that it received $4.5 million in

12   interest revenue even though $3,390,411 of that

13   amount was not paid during the fiscal year audited.

14           Do you have any familiarity with that

15   issue?

16       A.   I'm not aware of that level of detail.

17       Q.   Okay.  Do you have any understanding that

18   the reporting of the income of $3,390,411 was

19   inappropriate or incorrect?

20       A.   I did not pay attention to that.

21       Q.   Do you know if the audit of that past year

22   addresses this point?

23       A.   Which tax year are you referring to now?

24       Q.   So, this would be the audit for tax year

25   2014.

Nigel Patterson
January 12, 2024                                                    200

1                    Gary, can you pull up your folder 23?

2        Q.   Mr. Patterson, there's a new document

3    we'll pull up and mark as Exhibit 48.  It appears to

4    be an email Bates stamp Nigel Patterson 770 through

5    774.

6              Do you recognize this document?

7              (The email was marked as Defendant's

8    Exhibit No. 48 for identification.)

9        A.   Yes I do.

10       Q.   Can you tell us what it is?

11       A.    It appears to be an email to Neal Lee

12   asking him what is going on with, give me an update.

13   This is December 3, 2018 three days before I learned

14   that the $90 million loan had been written off and

15   that email doesn't mention anything about that

16   whatsoever.  So, it's making a claim to make me feel

17   good about myself.

18       Q.   So, you asked Neal December 1, 2018 is

19   there any update?

20       A.    Uh-huh.

21       Q.   And on December 3rd Neal responded with an

22   update?

23       A.    Correct.

24       Q.   And you're pointing out that the December

25   31, 2016 audit was about to issue with an

Nigel Patterson
January 12, 2024                                              201

1    allowance -- a loan allowance in it?

2         A.    Correct.

3         Q.    And you wanted Neal to provide that

4    information to you before the audit was issued?

5         A.    I had not heard anything about a write

6    down.  This was the very first time I heard about

7    it.  Neal would have definitely known about that and

8    refused to share that.

9         Q.    Well, this loan allowance seems to be a

10   serious concern for you.  I'm still trying to figure

11   out why.  It's an accounting function; right?  Do

12   you know what the loan allowance -- the definition

13   of a loan allowance is?

14        A.    If you could --

15        Q.    Do you -- I guess I just want to clarify.

16   Do you believe that the loan allowance prevents you

17   from recovering any part of your investment?

18        A.    That at the same time the (inaudible), the

19   same the partners capital account balance was grown

20   and the limited partners (inaudible) from 97,000

21   6.64 at the same time.  So, I read that as it is not

22   recoverable.  It's no longer owed to me.  It was

23   written off.  That's how I read that.  That's my

24   husband's position and that's my position.

25        Q.    And you haven't sought any professional

Nigel Patterson
January 12, 2024                                                      202

```
1    advise in that regard?

2         A.   Yes.  We've asked many times.

3         Q.   I'm talking independent professional

4    advise.  Have you sought any independent

5    professional advise as to the effect of the loan

6    allowance?

7         A.   Our tax implications, there are tax

8    implications in the writeoff.

9         Q.   So, is the answer to my question no?

10        A.   Well, whatever answer I gave is the answer

11   to your question.

12        Q.   I'm sorry?

13        A.   We spoke to the accountant about writing

14   it off, what the tax implications were.  So, we

15   spoke to the accountant and so, we did have the

16   conversation with the accountant.

17                  MR. JOYCE:  Gary, can you pull up 26

18   for me?

19        Q.   Mr. Patterson, we're going to mark another

20   new document.  This will be Exhibit 49.

21             (The email was marked as Defendant's

22   Exhibit No. 49 for identification.)

23        Q.   So, the very top has a date of May 21,

24   2021.

25        A.   Uh-huh.
```

Nigel Patterson
January 12, 2024                                           203

 1        Q.   It appears to be an email.

 2             Do you recognize this?

 3        A.   I don't recall this.  This is from Neal

 4   Lee to Alan Glock.

 5        Q.   So, you're shown as a CC on this.  You

 6   don't recall receiving this?

 7        A.   I don't recall reading this.

 8        Q.   So, this is a tax issue that you were

 9   depending on Alan to handle?

10        A.   Uh-huh.

11        Q.   27.  This is a very short one.

12             Do you recognize this document we're going

13   to mark as Exhibit 50 and it states Nigel Patterson

14   June 12 at 3:13.

15             (The June 12th email was marked as

16   Defendant's Exhibit No. 50 for identification.)

17        A.   Yeah.  So, that would be one of these

18   updates.

19        Q.   So, Mr. Glock received a share file

20   notification?

21        A.   Yeah, I would guess so.

22                  MR. JOYCE:  That's Exhibit 50.

23                  Gary, pull up folder 28.

24        Q.   Mr. Patterson, when you have this in front

25   of you, let us know?

1     UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3

HUI CAI, ET AL.,

4        Plaintiffs,

5

   vs.       Case No.

6         2:22-CV-02025-MWF (JPRx)

7 CMB EXPORT, LLC,

8       Defendant.
  _____

9

AND ALL RELATED CROSS-ACTIONS.

10 _____

11

12     VIDEOTAPED DEPOSITION OF

13       BO HUANG

14

15      January 21, 2024

16       12:31 p.m.

17

18    633 West 5th Street, Suite 4000

19     Los Angeles, California

20

21

22

23 Reported by:

24 Ronald H. Kim

25 CSR No. 12299, RPR

Bo Huang - CORRECTED
January 21, 2024

```
 1              BY MR. JOYCE:

 2      Q.      Did you understand the question?

 3      A.      Yes.   Improved the loan condition?

 4      Q.      Position.

 5      A.      Position.

 6              You know, from the fact it's -- it -- it's

 7  not really improving the passive investor position

 8  because we are not getting anything, and I can tell you

 9  on the K-1, all we get every year is an interest income.

10      Q.      What did you --

11      A.      That's all.

12      Q.      What would you -- what do you think you're

13  otherwise entitled to under these circumstances?

14      A.      Well, we could have had something back if

15  we would know it earlier, or you can say if Mr. Hogan

16  would have told us earlier.

17      Q.      And that's because you would file

18  bankruptcy, that you wanted the partnership to file

19  bankruptcy?

20      A.      Okay.   So, first off, bankruptcy is one

21  option.

22      Q.      Okay.   What's the others?

23      A.      The bridge loan opportunity is very

24  profitable and that --

25      Q.      And --
```

Bo Huang, CORRECTED
January 21, 2024

```
 1          A.      Go ahead.

 2          Q.      How -- how -- why do you say that's

 3   profitable?

 4          A.      Because on the 2016 audited financials

 5   issued in 2018 December, it says that -- if I don't

 6   remember wrong, it says the interest rate is 11.5

 7   percent.

 8          Q.      Uh-huh.

 9          A.      And, also, when we got a big fund a few

10   years ago -- I forgot when -- it was 4- to 5 million

11   dollar interest payment from the Bright Source Energy to

12   the CMB Group VII -- that money was used to pay off the

13   Hogan Family Trust loan, the bridge loan entirely.

14          Q.      But what were the -- do you have any

15   understanding of what was received in exchange for the

16   bridge loans?

17          A.      I don't think so.  I don't know.

18          Q.      And you mentioned that -- that the loans

19   were getting 11 percent.  Is it your --

20          A.      I think I have seen it, the percentage

21   somewhere.

22          Q.      So you think that that money got paid?

23          A.      For sure.  For sure because -- yeah.  For

24   sure, yes.

25          Q.      And what about the fact that CMB was
```

Bo Huang - CORRECTED
January 21, 2024

1   entitled to a management fee?  Was that paid back as

2   well?

3        A.    You mean the $35,000 thing or --

4        Q.    No, the fee that they charged for managing

5   the business?

6        A.    Oh, the annual interest income

7   pass-through?

8        Q.    Uh-huh.  Yes.

9        A.    I don't know.

10       Q.    Do you have any understanding whether you

11  have a fiduciary duty obligation to the other individuals

12  that you may represent in this putative class?

13       A.    Sure.

14       Q.    Yes?

15       A.    Yes.

16       Q.    Okay.  Tell me what those obligations --

17  those fiduciary obligations are.

18       A.    I'm representing them and come here to be

19  in a meeting and representing them.

20       Q.    Do you know when the class period would

21  begin?

22       A.    Class period?  You mean the court trial?

23       Q.    No.

24       A.    Can you rephrase it.

25       Q.    Let me ask it.

Bo Huang - CORRECTED
January 21, 2024

```
 1                  Do you know when the class period would

 2    end?

 3         A.     No, I don't.

 4         Q.     Do you know who would make a determination

 5    as to when that would end?

 6         A.     I don't.

 7         Q.     Did you know that CMB filed what we call a

 8    motion for summary judgment in this case?

 9         A.     I think so.

10         Q.     Have you reviewed that motion?

11         A.     I'm aware of it, yes.

12         Q.     Did you review it?

13         A.     No.

14         Q.     Do you know if your attorneys filed a

15    motion for class certification in the case?

16         A.     I think, yes, I've heard of it.

17         Q.     Do you know what a motion for class

18    certification is?

19         A.     No.  I don't recall.

20         Q.     Do you know if there's a hearing date on

21    the motion for class certification?

22         A.     Is that the same as the trial date or

23    different?

24         Q.     Different.

25         A.     I don't -- I don't know.
```

Bo Huang - CORRECTED
January 21, 2024

1        Q.      Have you made a commitment to attend

2    hearings in this case in person?

3        A.      I will show up in the -- in the trial

4    but -- I'm assuming.  You said hearing.  It's part of the

5    trial -- right? -- or not?

6        Q.      No.  A hearing may take place, you know,

7    from time to time on various motions.  That's not the

8    trial.

9        A.      Oh, it's not?

10       Q.      Yeah.

11       A.      Okay.  I will make myself available if they

12   need me.

13       Q.      Are you familiar with any individuals that

14   you know that have served as lead plaintiff in the class

15   action?

16       A.      No.

17       Q.      Have you agreed to accept any compensation

18   in exchange for serving as class representative?

19       A.      No.  I have to pay for the parking myself

20   too.

21       Q.      Okay.  Now, I mentioned the Complaint

22   earlier, and I think you indicated that you had read

23   that.

24       A.      Yes.

25       Q.      Was -- do you know if that was the first

Bo Huang - CORRECTED
January 21, 2024

1    Complaint or the --

2           A.      It's amended.

3           Q.      -- amended Complaint?

4           A.      Amended.

5           Q.      So you read the amended Complaint?

6           A.      Yes.

7           Q.      Did you read the original one?

8           A.      No.

9           Q.      Do you know if the -- this action seeks to

10   remove CMB as a general partner?

11          A.      Yes.

12          Q.      Why is this lawsuit seeking to -- to remove

13   the general partner?

14          A.      Because the general partner is doing what

15   have -- what is for his best interest, not really

16   representing all the limited partner fairly.

17          Q.      And your basis for that statement is what?

18          A.      I already mentioned it.  The loan

19   modification -- right? -- the bridge loans, and also

20   the -- he was hiding all the -- the facts.

21          Q.      And -- and I think you mentioned it, and I

22   didn't ask you yet.  You -- you were not presented an

23   opportunity to make those bridge loans; right?  Did you

24   say that?

25          A.      No.  I was not presented to make the bridge

Huang - CORRECTED
January 21, 2024

```
 1   loans.
 2        Q.     Did you want to make a bridge loan?
 3        A.     Well, here's the thing.  So if they would
 4   have told us earlier, we as a group, the plaintiff, we
 5   have lot of people in the group.  We might think about
 6   it, but there are many possibilities, and also there are
 7   many factors too, for example, the interest rate, the
 8   repayment plan and also the borrowing party's financial
 9   ability.  Okay?
10        Q.     So -- okay.  To say it another way, there's
11   a lot of -- lot of items to be considered?  Is that fair?
12        A.     It's fair.
13        Q.     And in retrospect, knowing the condition of
14   the borrower -- do you know what the condition of the
15   borrower is today?
16        A.     The condition of the borrower?
17        Q.     Yes.
18        A.     What do you mean by that?
19        Q.     Financial condition.
20        A.     Oh, financial condition.  You mean back
21   then or now?
22        Q.     Right now, today.
23        A.     I don't know everybody.  I don't.
24        Q.     No, no.  I'm just -- the borrower, Bright
25   Source, do you know --
```

Bo Huang - CORRECTED
January 21, 2024

```
 1          A.     Oh --

 2          Q.     -- what --

 3          A.     Sorry.  The --

 4          Q.     -- their financial --

 5          A.     -- borrower, not --

 6          Q.     -- condition is?

 7          A.     I think I know, yeah.  Yes.

 8          Q.     What do you know?

 9          A.     They don't have money to pay us.

10          Q.     Okay.  And had you made a bridge loan, do

11   you know if they would have repaid you?

12          A.     You know, it's -- it's -- it's not really

13   based on whether or not they repay me; right?  It's just

14   at that time, if we get a chance to see all the details

15   of the loan or loan terms, we could have do something

16   differently.

17          Q.     Did you agree that CMB would be in charge

18   of all business affairs of the partnership?

19          A.     I mean, yes and no.

20          Q.     Do you think -- do you think you owe any

21   money to the partnership?

22          A.     No.

23          Q.     You don't; right?

24          A.     I don't.

25          Q.     Just to be clear, are you saying you don't
```

Huang - CORRECTED
January 21, 2024

1    know, or you don't --

2         A.    I don't --

3         Q.    -- owe?

4         A.    I don't owe.

5         Q.    You don't owe anything?

6         A.    I don't -- I mean, the partnership owes

7    money to the Hogan family, but as a limited partner, our

8    loss is also limited to whatever we have put down,

9    initial investment.  That's -- that's all.

10        Q.    Right.  Can you describe the claims that

11   you're bringing in the lawsuit.

12        A.    The claims in the amended Complaint?

13        Q.    Uh-huh.

14        A.    I cannot memorize everything, but, first

15   off, like what I mentioned earlier, those three items

16   that I was mentioning, the fiduciary duty, they did not

17   represent us fairly.

18        Q.    So are you seeking damages?

19        A.    Yes.

20        Q.    And what damages are you seeking?

21        A.    We cannot really quantify the damage as of

22   now because, you know, we've got to -- we've got to hire

23   somebody, expert, to do this for us.

24        Q.    And can you describe generally how you've

25   been damaged.  I understand -- I think what you're saying

Bo Huang - CORRECTED
January 21, 2024

1    is, you know, you can't quote me a figure; right?

2         A.    Yes.

3         Q.    Is that fair?

4         A.    So what we could have been damaged is, when

5    Mr. Hogan knew our investment money is not coming back or

6    being paid back, he should have let us know earlier and

7    also --

8         Q.    Just stop you there for a second.  How has

9    that cost you money?

10        A.    Because like what I said earlier, we could

11   have done something differently.  For example, the

12   bankruptcy --

13        Q.    Right.

14        A.    -- right? -- and also the recourse loan --

15   sorry, not the recourse loan.  I keep saying that -- but

16   bridge loan, the bridge loans, you know, all the

17   plaintiff, if it's really profitable, because we don't

18   really have all the information, if Mr. Hogan would have

19   given us all the loan terms and ask us for opinion, we

20   would have -- we would probably join it, but we did not

21   even have any information until 2018.  So --

22        Q.    So I guess what I -- what I didn't hear in

23   there is what -- what's the nature of the monetary

24   damage?

25        MR. GAW:  Objection, misstates prior testimony.

1          Go ahead.

2          THE WITNESS:  Like what I said, the -- I cannot

3     really quantify it, but we will find a litigation CPA or

4     accountant to do that or expert.

5          BY MR. JOYCE:

6     Q.     And what is he going to calculate?

7     A.     I don't know.

8     Q.     Have you suffered any adverse tax

9     consequence as a result of --

10    A.     So every year, we -- we have the interest

11    income.  I call it a phantom income because we never

12    receive any income in cash or in the bank account, but we

13    get an -- we get an interest income reported on the K-1

14    form that will make us pay the income tax.

15    Q.     So that's an adverse tax consequence that

16    you've received phantom income?

17    A.     Yes.

18    Q.     And have you received a K-1 for all the

19    years that you've participated as a limited partner?

20    A.     Yes.

21    Q.     And did you incorporate or otherwise

22    utilize the K-1 for every tax year that you've filed?

23    A.     Yes.

24    Q.     Do you prepare your returns yourself?

25    A.     Yes.

Bo Huang - CORRECTED
January 21, 2024

1        Q.      Do you have any other investments that are
2    identified in your tax return?
3        A.      No.  I only have my own S-Corporation and
4    one K-1 from the CMB.
5        Q.      And do your returns show a loss for the
6    Group VII investment?
7        A.      It's -- it's a passive loss.  There's a
8    passive loss limitation so I cannot really utilize that
9    loss.
10       Q.      So have you -- you have an offset, any loss
11   against any income --
12       A.      No.
13       Q.      -- or capital gain?
14       A.      Okay.  So this is more like tax language.
15   Passive loss can only be used to offset the passive
16   income.  The interest income -- or you can say the
17   dividends are not passive income.  By tax language, they
18   are investment income.
19       Q.      So you can't use these losses to offset
20   income?
21       A.      Yes, you can, but under certain conditions.
22       Q.      What -- I know you're a tax preparer so --
23   I mean, do you know what the conditions are?
24       A.      Yes.  So when you have -- let's say when
25   you have rental income, that's a passive income, and you

Bo Huang - CORRECTED
January 21, 2024

1    can use, you know, some K-1 losses from the CMB to offset

2    that rental income --

3         Q.     Uh-huh.

4         A.     -- or you have some passive K-1's from

5    other company or partnerships.

6         Q.     And -- but your personal return, you have

7    not offset any losses?

8         A.     No.  For me, for myself -- I cannot really

9    say this for my other plaintiff -- but for me, I cannot

10   use it.  I have a carryover.

11        Q.     Okay.  So -- and -- you just said that

12   you're not aware of the other -- the -- whether the other

13   plaintiffs could utilize that --

14        A.     And --

15        Q.     -- tax loss?

16        A.     This is very personal information so I

17   would not ask.

18        Q.     Can we take a five minute break?  You okay?

19        A.     Yeah, please.

20        THE VIDEOGRAPHER:  We're off the record at

21   1:39 p.m.

22             (A short break was taken.)

23        THE VIDEOGRAPHER:  This marks the beginning of

24   Media No. 2.  We're on the record at 2:01 p.m.

25             BY MR. JOYCE:

Bo Huang - CORRECTED
January 21, 2024

1        Q.      Okay.  Mr. Huang, I'm going to hand you a

2  document that was previously marked as No. 36.  I don't

3  have the -- I didn't get the transcript back.

4        MR. GAW:  Yeah.  That's fine.

5        MR. JOYCE:  I don't have the little sticker, but I

6  can represent to you that it was marked as 36 in the

7  prior -- Nigel's deposition.

8        MR. GAW:  Thank you.

9            (Previously marked for Identification,

10            Defense Exhibit No. 36,

11            Transcript.)

12            BY MR. JOYCE:

13        Q.      Okay.  As you can see, this face page in

14  this document is titled, "Amended Class Action

15  Complaint," and the question to you is have you seen this

16  before?

17        A.      Oh, yes.

18        Q.      Okay.  And when did you first see it?

19        A.      I don't remember the exact date, but I have

20  seen this.

21        Q.      All right.  And just to orient you a little

22  bit, if you can go to Page 3.  And I'm going to read from

23  Paragraph 5 here.

24            It says, "In or about November 2011, CMB

25  arranged for Group VII Partnership to make a 90 million

1    said, the issue is not about writing off the loan.  I'm

2    the investor.  I bear the risk, but what they did wrong

3    was this report was not issued until December 8 -- I

4    mean, 6th, 2018, so that's literally two years later, and

5    when we reviewed all the documents --

6         Q.    What would have changed had you known about

7    it in 2016?  Let's say they --

8         A.    The write-off?

9         Q.    First of all, how long -- you know, how

10   long does it take to do an audit?  It depends on when

11   your prior yearend is completed; right?

12        A.    Sure.

13        Q.    You have to complete the prior year before

14   you can start the audit for the next year; right?

15        A.    Well, I don't do audit so I don't know the

16   timeline.  So --

17        Q.    Okay.  So let's -- let's assume that you

18   were informed immediately in 2016 that we think we're not

19   going to recover from this -- on this loan.

20        A.    So --

21        Q.    What would have changed?

22        A.    I mentioned the bankruptcy; right?  So the

23   assets ten years ago was worth more than it is today.

24   The assets depreciate, especially for the -- for the

25   solar plant.  Back then, it was a great idea to -- to put

1   investment into the solar program, but now --

2          Q.      You know the borrower --

3          A.      -- it's not worth anything.

4          Q.      You know the borrower does not own any

5   piece of that solar plant?

6          A.      But we can --

7          MR. GAW:  Objection, lacks foundation.

8                  Go ahead.

9          THE WITNESS:  But when they -- when they did not

10  repay the loan, the principal part, we can also declare

11  that they are in default for the loan.

12                 BY MR. JOYCE:

13         Q.      Do you know if CMB declared them in

14  default?

15         A.      I don't know.

16         Q.      What would that get -- you know, how

17  would -- how would the partnership benefit?

18         A.      Well, so that part we need the expert to do

19  the calculation.  I don't know how to do it myself.  Like

20  what I mentioned earlier, we have no records on the BSE

21  financial statements.  How would I assess their -- their

22  financial ability and also the valuation of their assets?

23         Q.      So if you can't assess their ability, then

24  how can you blame CMB?

25         A.      Well, they -- they could have notified us

 1  earlier; right?

 2       Q.    Well, let's say they did.  How -- what

 3  position -- well, how -- how would your position be any

 4  different today?

 5       A.    Well, if they didn't notify us, that might

 6  be different; right?  I don't really think about the

 7  consequence, but the fact is they did not tell us until

 8  December 6, 2018.

 9       Q.    I'm saying -- okay.  Let's assume that's

10  true.

11       A.    Sure.

12       Q.    You didn't know anything before December

13  2018 --

14       A.    Sure.

15       Q.    -- right?  If you had known December 31,

16  2016, that information, how would it have changed?  How

17  would you have been harmed?

18       A.    Well, I'm a class representative; right?

19  So I'm just saying that they did not report it to us.  I

20  cannot really assess the consequence at this moment, and

21  it's going to be a decision made in our group of

22  plaintiffs, but we have the rights to know.

23       Q.    But you don't know what you would have done

24  differently had you known two years --

25       A.    Oh, I already --

1        Q.      -- earlier.

2        A.      I already mentioned bankruptcy.  We force

3    them to file bankruptcy -- right? -- or just sell their

4    assets to at least get us something.

5        Q.      What would it -- if they filed bankruptcy,

6    what would happen to the Department of Energy loan?

7        MR. GAW:  Objection, lacks foundation.

8            BY MR. JOYCE:

9        Q.      You don't know; right?  You don't --

10       A.      I don't --

11       Q.      -- know what would happen.

12       A.      I don't know.

13       Q.      Okay.  All right.  So let's just try and

14   get through this.  So the next year-end audit is

15   December 31, 2017, was previously marked as Exhibit 22.

16           (Previously marked for Identification,

17            Defense Exhibit No. 22,

18            12-31-17 Year-end Audit.)

19           BY MR. JOYCE:

20       Q.      Do you recall receiving this one?

21       A.      Let me take a quick look.

22           (A pause in the proceedings.)

23       THE WITNESS:  Okay.

24           BY MR. JOYCE:

25       Q.      Do you recognize this to be --

Huang
January 21, 2024                                    241

1          A.     Yes.

2          Q.     -- the audit for Group VII year-end,

3    December 31, 2017?

4          A.     Yes.

5          Q.     And did you receive it?

6          A.     Yes, in the e-mail.

7          Q.     Okay.  And look at the next one, which

8    would be year-end December 31, 2018.  It's previously

9    marked as Exhibit 17 in this proceeding.

10                (Previously marked for Identification,

11                 Defense Exhibit No. 17,

12                 December 31, 2018, Year-end Audit.)

13         THE WITNESS:  Yes.

14                BY MR. JOYCE:

15         Q.     So do you recognize this to be the audit

16   report for Group VII yearend, December 31, 2018?

17         A.     Yes.

18         Q.     Did you receive this audit report?

19         A.     Yes, in e-mail.

20         Q.     And you reviewed it when -- sometime after

21   you received it?

22         A.     I believe so.

23         Q.     All right.  Can you look at the next one

24   for me, December 31, '19.  It was previously marked as

25   23.

Haipeng Liu  CORRECTED
January 23, 2024

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

HUI CAI, et al.,

        Plaintiffs,

vs.                        CASE NO.
                              2:22-CV-02025 MWF (JPR)

CMB EXPORT LLC,

        Defendant.

_____


VIDEO DEPOSITION OF HAIPENG LIU

January 23, 2024

10:07 a.m.

Los Angeles, California


Reported By:
Brandi R. Celestino
CSR No. 13640

Haipeng Liu   CORRECTED
January 23, 2024

1    money for -- by the general --

2            Do you know if CMB was owed money by the

3    partnership?

4       A    Owed money by the partnership?

5       Q    Owed money for the partnership; right?

6       A    So the partnership should pay CMB money?

7       Q    Right.

8            Does the partnership owe CMB money?

9       A    Yes.

10      Q    It does?

11      A    Yes.

12      Q    Do you know how much?

13      A    I forgot the number.

14      Q    Is it more than a million?

15      A    It's on the financial statement.

16      Q    I'm just asking what you know today.

17      A    I don't know the number.

18      Q    Do you know if it's more than a million?

19      A    Yes.

20      Q    It is?

21      A    Yes.

22      Q    Do you know if it's more than 10 million?

23      A    I don't know.

24            MR. JOYCE:  I'm going to hand a document that

25    is entitled "Amended Class Action Complaint."  It's a

Haipeng Liu    CORRECTED
January 23, 2024

1    total of 28 pages.  It was previously marked in this

2    proceeding as Exhibit 36.  Thank you.

3    BY MR. JOYCE:

4        Q    Take a minute to look at that for me.

5        A    Yes.  I have seen this document.

6        Q    You have seen the document before?

7        A    Yeah.  Let me remember the name of it.

8        Q    Do you recall when you first saw it?

9        A    I don't remember.

10       Q    Did you have any input into the allegations

11   that are made in this complaint?

12       A    Input?  Yes.  We had phone call with our

13   attorney.

14       Q    Did you provide any information to your

15   counsel regarding this complaint?

16       A    I'm not sure if the information supplied is

17   in here, but I agree with the complaint.

18       Q    Can you tell me how you've been harmed by the

19   actions of CMB in this case?

20       A    Okay.  So first of all, again, when CMB

21   realized that the BSE has a cash flow difficulty, it

22   lend the money to them, and then had loan modification

23   that tells the BSE that, okay, you can only -- you can

24   pay the interest only.  You can pay the principal

25   later.

Haipeng Liu   CORRECTED
January 23, 2024

 1            So all the interest -- so BSE pay the

 2    interest to Group VII.  But because of the structure

 3    of Group VII, that -- as a limited partner, we can

 4    only get 1 percent of interest.  That's the max.  And

 5    CMB will get the rest.  CMB is keeping getting money,

 6    but for Group VII couldn't get their principal back.

 7    In other words, if they could --

 8            COURT REPORTER:  Say that again, in other

 9    words --

10            THE WITNESS:  In other words, if they could

11    ask BSE to pay some portion of principal, we could get

12    our money back.  So we don't have to pay tax.  I still

13    remember that one year of K-1, we don't receive any

14    money, but our K-1 we have an interest income, and we

15    have to pay tax on that.  So that means we are not

16    getting money, but we are paying the tax.  So really

17    doesn't make sense.

18    BY MR. JOYCE:

19        Q    That one year that you had interest income,

20    do you know what that -- which loan that interest

21    income was earned?

22        A    Which loan?

23        Q    Uh-huh.

24        A    I don't understand the question.  The CMB

25    loaned the money to BSE, so it's a loan that -- the

Haipeng Liu  CORRECTED
January 23, 2024

1    BSE owed the Group VII.

2        Q    So your understanding -- I'm trying to make

3    sure I understand.

4            Your understanding is that the interest

5    income that you earned in that one particular year was

6    on the $90 million loan that Bright Source paid?

7        A    I don't know how CMB manages that.  It might

8    be or might not be.  Anyway, if we don't receive the

9    money, and -- how can we pay the tax on that?

10       Q    So it's -- it was listed as income earned,

11   but you didn't receive the money.

12           Is that what you're saying?

13       A    It's called the -- yes.  It's interest

14   income.  So if the money didn't go to our personal

15   account, but it's not within the Group VII, the CMB

16   Group VII, so I don't know where the money went to,

17   and who we are paying tax for for the money we didn't

18   receive.

19       Q    So income -- again, making sure.

20           Income appeared to be earned on your K-1;

21   right?

22       A    (No audible response.)

23       Q    And you're not sure why that income appeared

24   on your K-1, because you didn't get it?  Is that what

25   you're saying?

Haipeng Liu    CORRECTED
January 23, 2024

    1      A    Yes.  Let me explain more.

    2           So I'm doing business.  So let's say if we

    3   receive this income, if the income goes to my personal

    4   account, yes, we should pay for the tax.  But if the

    5   income come into Group VII, and whatever the income

    6   goes to other places not stayed in Group VII, and

    7   the -- that should be expense for us.  So there's the

    8   income and expense.  We're playing the tax space on

    9   net income, but now there's no expense.  But if

   10   there's no expense, where did money go?

   11      Q    So are you saying that the K-1 was incorrect?

   12           MR GAW:  Objection.  Vague as to time.

   13   BY MR. JOYCE:

   14      Q    Do you recall when this interest income was

   15   earned or what year it appeared?

   16      A    I don't remember which year, but it is on the

   17   financial statement or the K-1s.  If you can show me,

   18   I can point to you.

   19      Q    So whatever year it is, that that interest

   20   income was earned, are you -- is it your contention

   21   that the K-1 was inaccurate?

   22      A    I don't know if it's K-1 accurate, or there

   23   is some conduct as a general partner did, makes the

   24   K-1 look so weird.

   25      Q    Did you also receive audits for the Group VII

Haipeng Liu    CORRECTED
January 23, 2024

1    partnership?

2        A    Yes.

3        Q    Do you contend that that interest income that

4    you're referring to was incorrectly recorded for the

5    audit purposes?

6        A    Audit purposes.  I need to know which year it

7    is, so I can refer to that year's audit report,

8    because the audit report is --

9        Q    Go ahead.  Finish.

10       A    Yeah.  The audit report was, like, two years

11   after.  Like, two years late.  So it's not even

12   helpful for us.

13       Q    If I showed you the audits, would you be able

14   to point me to this interest income that you say was

15   listed as earned?

16       A    Can you show me both the audit report and the

17   K-1, so I can match?

18       Q    If I showed you both, do you think you can

19   find it?

20       A    I may be able to find it.

21       Q    Okay.

22            Tell me what you're seeking in this lawsuit.

23            What do you want?

24       A    I think I want -- I mean, to recover some of

25   our loss.

Haipeng Liu    CORRECTED
January 23, 2024

1      Q    Do you know what that is?  What have you

2   lost?

3      A    You mean the amount?

4      Q    Yes.

5      A    I don't know what the total amount, but I

6   think my attorney would help me to figure it out.

7      Q    So, as you sit here today, you don't know

8   what you lost?

9      A    Well, if you look at the book --

10     Q    The book?

11     A    No.  Not book.  If you look -- well, if you

12   look at the document, at least I lost half a million

13   dollars of investment, but it's my -- I'll let my

14   attorney make the call, make the decision, like, what

15   is my loss.

16     Q    Do you think that you're entitled to receive

17   part of your half million --

18          Let me ask you this:  Do you think you're

19   entitled to receive, or are you asking to receive half

20   a million dollar investment back in this lawsuit?

21     A    I'm not asking half -- the entire half

22   million back.  I'm asking, like, what I should have

23   received if CMB has done correctly, and that's what

24   I'm asking.

25     Q    But you can't tell me what that is, as you

Haipeng Liu  CORRECTED
January 23, 2024

1    sit here today?

2        A    I'm not a professional in that area.

3        Q    Generally, categorically, as a category, can

4    you tell me where you've been monetarily harmed?

5             MR GAW:  Objection.  Vague.

6    BY MR. JOYCE:

7        Q    You can answer.

8             Is the answer to my question no?

9        A    It's -- I don't understand your question

10   really.

11       Q    Let me try to rephrase it.

12            I'm asking you what you're seeking in the

13   lawsuit; right?

14       A    Yes.

15       Q    And I think you said, I'm due part of what

16   I'm owed.  So I'm trying to figure out, and I asked

17   you, does that mean the half million dollars?  Right?

18   And you said not the whole half million dollars.

19            So what part of the half million dollars are

20   you seeking?

21       A    Okay.  We are looking for the damage that CMB

22   made to us, but I'm not a professional.  I don't know,

23   like, what is the damage.  So for that part, I'll

24   leave this to my attorney.  That's why we hired him.

25       Q    But you must -- I shouldn't say you must.

Haipeng Liu    CORRECTED
January 23, 2024

1           You believe you've been hurt financially?

2      A    Yes.

3      Q    Very basically, I just want to know why.

4 What has occurred -- what did CMB do that hurt you

5 financially?

6      A    Okay.  So you asked this question before I

7 didn't finish my answer, so I'll continue.  I'll start

8 over.

9           First of all, if CMB has done differently

10 rather than do the loan modification and do the bridge

11 loan, we may have -- when we recover some of our loss,

12 and also the bridge loan is -- I believe it's

13 11 percent interest with security, and also one-time

14 premium.  That means whatever we -- makes the loan to

15 BSE, that will not only pay 11 percent of interest,

16 they will pay double or the principal back to us.  So

17 that's really good investment.  As our general

18 partner, CMB did use Hogans Family Trust, which is

19 their related party to mixed investment.  As a general

20 partner, if they put ours as a limited partner's

21 interest first, they should first offer this option to

22 us.

23      Q    I'm sorry.

24           Are you finished?

25      A    That's first.

Haipeng Liu  CORRECTED
January 23, 2024

1              And then the second thing is, like, CMB is

2    downplaying all this -- all this issue.  Like, I

3    didn't realize how serious it is until I got, like,

4    2016 audit report, which was issued two years later,

5    like 2018.  At that time we realize, okay, we're not

6    getting our money back.  Before that, CMB gave us the

7    impression that we are going to get our money back.

8    And the -- I think that is a really unprofessional

9    that you send the audit report two years later, which

10   has critical information about this group.

11        Q    So prior to receiving that information that

12   you indicated was the 2016 audit --

13        A    Yes.

14        Q    -- did you have any other understanding that

15   the loan was troubled?

16        A    We had a meeting -- when the loan was due, it

17   wasn't repaid.  So we had a meeting with CMB.  I think

18   Mr. Hogan was in that meeting, too, and he explained

19   to us -- at the beginning of the meeting, a lot of

20   investor -- I'm not the only one in that meeting, so

21   they were worried about our situation or our

22   investment, but after meeting, Ms. Hogan make us feel

23   like we'll get our money back.  But then --

24        Q    So that meeting, do you recall when that was?

25        A    I believe it's 2018.

Haipeng Liu   CORRECTED
January 23, 2024

1      Q     All right.

2            So my question was, did you have an

3      understanding before you received the audit for 2016,

4      that the loan was in trouble?

5      A     So before that meeting, we -- when the loan

6      was due, we didn't get the money back.  We thought the

7      loan was in trouble.  After we have that meeting with

8      CMB, we thought the loan was safe, and then we got

9      this audit report by the end of 2018.  We saw that

10     entire $90 million was a write-off.  It clearly says

11     we're not getting our money back.  So the time

12     difference is really damage to us, because if we knew

13     that in 2016 there's some problem with CMB or us,

14     could have done something differently.

15     Q     What would you have done differently if you

16     had known earlier that the loan, as you say, was not

17     going to be repaid?

18     A     At least we'll hire attorney, talk to CMB,

19     just ask BSE to bankrupt, because at that time they

20     still have, like, a value, and -- or we can ask the

21     CMB to sue the BSE not giving them, like, extra time.

22     Just pay the interest, you know?  The 11 percent

23     interest, when they paid back to Group VII, we only

24     get 1 percent.  CMB, as a general partner, get

25     10 percent.  Clearly, they are putting their interest

Haipeng Liu    CORRECTED
January 23, 2024

1    also goes to CMB.  We were okay for the initial

2    investment, but when there's something wrong with the

3    borrower, and the general partner use this regulation

4    or the structure, and to do whatever benefits them

5    mostly, not the limited partner, I think that's not

6    right.

7        Q    Again, my question was slightly different,

8    which was, the -- that structure that you told just --

9    repeat it about how CMB got 4 percent of the interest

10   and the limited partners only got 1 percent of the

11   interest; right?  That was in the initial partnership

12   agreement that you signed off on?

13       A    Yes.

14       Q    So if you, as a limited investor, was going

15   to make a loan to the borrower, in order to get a

16   higher rate of interest, you'd have to change the

17   limited partnership agreement; right?

18       A    We don't have to.  If he just asked them to

19   pay back the principal first, we don't have to change

20   anything.

21       Q    But they didn't repay any principal; right?

22       A    Well, they pay the money.  It just depend on

23   how CMB negotiate with them for the loan modification.

24   Is it interest first or loan first?  If it's interest

25   first, it benefits the general partner.  If it

Haipeng Liu    CORRECTED
January 23, 2024

1    interest first, it actually benefits us.

2        Q    Understood.

3            So part of what you're complaining about is

4    you think the general partner should have negotiated

5    so that some part of the principal was repaid to the

6    limited partners?

7        A    Yes.

8        Q    Okay.

9            MR. JOYCE:  Is everybody okay?  Can we finish

10    this little section?  Quarter to 12:00, and lunch is

11    here.  Maybe we can go another 15 minutes and then

12    break?

13            MR GAW:  Sounds great.

14            MR. JOYCE:  Okay.  Great.  Thanks.

15    BY MR. JOYCE:

16        Q    So we started this topic a while ago, and I

17    had asked you, you know, what were you seeking from

18    this lawsuit.

19        A    Okay.

20        Q    Right?  And you told me there was some --

21    there was financial harm.  Okay.

22            And then I asked you if you could break it

23    down, and you indicated that you'd have to rely upon

24    some --

25        A    Professionals.

Haipeng Liu    CORRECTED
January 23, 2024

1        Q     -- professionals to do that?

2        A     Yeah.

3        Q     As you sit here today, do you believe there's

4     a figure that you believe you're owed?

5        A     No, I don't.

6        Q     Is the limited partnership obligated at the

7     present moment to pay CMB money that it owes CMB?

8        A     It's limited partner -- could you repeat that

9     again?

10       Q     Do you know, is the limited partner today

11    obligated to repay CMB money that it owes to CMB?

12             MR GAW:  Objection.  Vague.

13             You said "limited partner."  Do you mean

14    limited partnership or him as limited partner?

15             MR. JOYCE:  Let me reask it if I mixed that

16    one up.

17    BY MR. JOYCE:

18       Q     Today, do you know whether the partnership,

19    Group VII, is obligated to repay monies to CMB?

20       A     Oh, okay.

21             So, yes.  Under the -- again, under the

22    structure of this partnership, we do -- the limited

23    partnership still owns general partner money, but,

24    again, we have to see why this is happening.  It's all

25    about the high interest.

Haipeng Liu   CORRECTED
January 23, 2024

1      Q    Do you think you're entitled to anything else
2   in this lawsuit other than monetary damage?
3      A    I don't know.
4      Q    Okay.
5           But it -- your primary motivation is you want
6   to recover some money; is that fair?
7      A    I mean, if there's anything else, I'm sure my
8   attorney will help me.
9      Q    But my question is you personally.
10          Your motivation is you want to get some of
11  your money back?
12     A    Yes.  And to stop the bleeding.
13     Q    Are you aware that if CMB prevails in this
14  lawsuit, you could be liable for CMB's cost?
15     A    I didn't know.
16     Q    You don't know that?
17     A    I don't know that.
18     Q    Do you have any agreement to pay for cost
19  that are incurred in this litigation?
20     A    Yes.
21     Q    Who is that agreement with?
22     A    With my attorney.
23     Q    So you have an agreement that your attorneys
24  would pay for the cost of the litigation?
25          MR GAW:  I'm going to object on

1    attorney-client privilege.

2              And instruct you not to answer that question.

3              (Witness instructed not to answer.)

4    BY MR. JOYCE:

5        Q    Do you have any agreement that if CMB

6    prevails in this lawsuit, if required to pay costs,

7    you personally will pay the cost?

8        A    Say that again.

9        Q    Do you have any agreement that if CMB were to

10   prevail in this lawsuit, and costs were awarded, that

11   you would personally pay those costs?

12       A    I don't have an agreement with that.

13       Q    Do you have any idea what the cost may be if

14   this case were to proceed to trial?

15       A    No.

16       Q    Have you filed United States tax returns?

17       A    Yes.

18       Q    When did you start filing U.S. tax returns?

19       A    I think since I become, like -- have the

20   green card.

21       Q    Do you recall basically when you got the

22   green card, roughly?

23       A    I think I got my green card in 2012 or 2013.

24   Either '12 or '13.

25       Q    Okay.

1           Let me ask you this first:  Did you utilize

2    the K-1s when you filed your tax returns?

3       A    Yes.  We have to use it.

4       Q    Who prepares your tax returns?

5       A    My CPA.

6       Q    And you indicated you have other investments

7    through your company; right?

8       A    Yes.

9       Q    Is that company a sub S-corporation?  Do you

10   know?

11      A    We have an LLC, C-corp, and S-corp.

12      Q    So you have an LLC, a C-corp?

13      A    And S-corp.

14      Q    And an S-corp?

15      A    Yeah.

16      Q    Okay.

17           Do you understand the difference between a

18   C-corp and the S-corp?

19      A    Yeah.

20      Q    The S-corp is the money flowing down to you

21   individually; right?

22      A    Right.

23      Q    Do you know if any of your tax returns show a

24   loss for the Group VII investment?

25      A    2018 --

Haipeng Liu  CORRECTED
January 23, 2024

1          COURT REPORTER:  Speak louder.  When you

2    think out loud I have to write it.

3          THE WITNESS:  Yes.  There was one-year tax

4    returns showing that we have a loss.

5    BY MR. JOYCE:

6     Q    Do you know if any of your tax returns

7    seek -- have sought to offset that loss against any

8    gains or income?

9     A    I don't remember.

10     Q    So you don't know if you ever sought to

11    offset those gains with the loss that was obtained as

12    a result of the CMB Group VII investment?

13     A    I don't remember.

14     Q    If you saw your tax returns, would that

15    refresh your recollection?

16     A    Yes.

17     Q    So that information would be on your tax

18    return; right?

19     A    Yes.

20     Q    If I ask you this, do you know if you were

21    able to take a deduction as a result of the losses

22    incurred in the Group VII investment?

23     A    Deduction?

24     Q    Uh-huh.

25     A    It's the same question; right?  If I have an

Haipeng Liu    CORRECTED
January 23, 2024

1    income, and I have a connected K-1?

2        Q    Uh-huh.

3        A    It's very difficult for us to use the

4    negative K-1, because it's treated as capital loss.

5    The most of our income are not capital gain.  So it's

6    hard for us to use those loss.

7        Q    Now, I understand your point.  It's limited.

8             It has some conditions?

9        A    Yes.  Very limited category.

10       Q    But you're not sure whether or not you've met

11   any of those conditions on your tax returns, as you

12   sit here today?

13       A    I don't remember.

14       Q    I have what we previously marked as

15   Exhibit 36 in this proceeding.  This is the amended

16   class action complaint.  If I could direct your

17   attention to page 18, specifically there's a paragraph

18   101.  It starts at line 8 there.  If you could read

19   that to yourself for a minute.

20       A    Okay.

21       Q    Are you alleging that CMB caused you, as a

22   limited partner, to face adverse tax consequences?

23       A    Face adverse tax consequences?

24       Q    Right.

25            Did you --

Haipeng Liu    CORRECTED
January 23, 2024

1      A      Yes.

2      Q      Did you incur adverse tax consequences as a

3   result of what CMB did?

4      A      Yes.

5      Q      Did you agree to waive that loss, that

6   adverse tax consequence?

7      A      Waive?  Waive from who?

8      Q      Give it up.

9            Would you agree to not seek that?

10            MR GAW:  Objection.  Attorney-client

11   privilege.

12            Don't -- you can answer the question, just

13   don't discuss anything that you would -- you may have

14   discussed with your attorneys about it.

15            I also note that plaintiffs have stipulated

16   that they are not going to pursue adverse tax

17   consequences.

18            Go ahead.

19            THE WITNESS:  I mean, if there is any loss or

20   damage to me, and I pay their attorney fee, I think I

21   should recover that.

22            MR. JOYCE:  Its' a good time to break if

23   everybody is okay.

24            THE VIDEOGRAPHER:  This marks the end of

25   Media No. 1.  The time is 12:03 p.m., and we're off

Haipeng Liu   CORRECTED
January 23, 2024

1    the record.

2              (Lunch recess taken.)

3              THE VIDEOGRAPHER:  Here begins Media No. 2 in

4    the continuing deposition of Haipeng Liu.  The time is

5    12:39 p.m., and we're back on the record.

6    BY MR. JOYCE:

7        Q    Mr. Liu, present day, what is your

8    immigration status?

9        A    Green card.

10       Q    And prior to becoming -- has your citizenship

11   changed?

12       A    No.

13       Q    You're a citizen of which country?

14       A    China.

15       Q    You indicated earlier that you obtained

16   permanent residency around 2012, 2013?

17       A    Yes.

18       Q    How did you hear about the EB-5 program?

19       A    My immigration lawyer recommend to CMB.

20       Q    How did you choose CMB to assist you with

21   that EB-5 program?

22       A    Well, they only recommend CMB to me.

23       Q    What was your primary purpose in investing in

24   Group VII?

25       A    To get the green card and get my investment

Haipeng Liu    CORRECTED
January 23, 2024

 1      A     Economic interest.

 2      Q     Which economic interest?

 3      A     What's it called?  Promissory note.

 4      Q     Okay.

 5            So the promissory note was issued when the

 6      loan was made?

 7      A     Yeah.  That's my understanding.

 8      Q     Do you have an understanding what a

 9      promissory note is?

10      A     For me it's some sort of security.

11      Q     Well, it's a promise to pay a loan, if you

12      accept that definition.  Okay?

13            Is that -- in your -- to your understanding,

14      is that different than security for repayment of the

15      loan?  In other words, one is a promise to pay; right?

16      A     Okay.

17      Q     I will pay you back.

18            Security may be different in that it may

19      pledge an asset to secure the promise.

20      A     Okay.  I was talking about the 12.4 percent

21      of economic interest ownership.

22      Q     Which is owned by the partnership?

23      A     Well, if we do it differently, it can be

24      owned by the new entity.

25      Q     Your partnership already owns it.

Haipeng Liu    CORRECTED
January 23, 2024

```
1      A    I'll prefer my -- the new entity to --

2      Q    Why?

3      A    To secure that interest.

4      Q    What's not secure about it?

5      A    Well, not secure about it is what happened

6  right now.  Like, general partner is getting cash flow

7  each year.  We are not.

8      Q    So what you want to do is cut out CMB and not

9  pay them?

10     A    Not cut off.  It's just -- okay.  We, as a

11 limited partner, we give up our partner.  We give

12 power to general partner.  So general partner

13 shouldn't have this power, but also should take more

14 responsibility.

15     Q    Responsibility for what?

16     A    To take care of our interest.

17     Q    How did it not take care of your interest?

18     A    The bridge loans.  Yeah.  The term of the

19 bridge loan is harming our interest, as we discussed

20 before.

21     Q    Can you turn to page ID No. 6712 towards

22 the -- more towards the beginning.

23     A    Okay.

24     Q    I'm reading from under Section B there in the

25 middle of page, if you go down to the last paragraph
```

Haipeng Liu    CORRECTED
January 23, 2024

1    on that page.

2         A    Okay.

3         Q    First sentence, "Instead of declaring default

4    or pursuing any collection on the note, CB executed a

5    second loan modification."

6              Do you see that?

7         A    Yes.

8         Q    So are you -- you're saying CMB should have

9    declared a default on the $90 million loan; right?

10        A    They could declare a default or give us the

11   opportunity to do the bridge loan.

12        Q    Do you know whether or not CMB declared a

13   default?

14        A    Whether or not it declared a default?  I

15   don't know.

16        Q    Well, you're saying instead of declaring a

17   default, it assumes that a default was not declared;

18   right?

19        A    Okay.

20        Q    Then it's pursuing collection on the note.

21             What was -- what should CMB have done to

22   collect on the note?

23        A    Collect on the note.  I think what CMB can do

24   is ask them to pay the principal first.

25        Q    Why?

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

CASE NO.:  2:22-CV-02025 MWF (JPR)


HUI CAI, et al.,

          Plaintiffs,

 -vs-

CMB EXPORT LLC,

          Defendant.
_____/



          Videotaped Deposition of JULIE TURNBULL

               (Pages 1 through 246)



          Wednesday, January 31, 2024
               9:08 a.m. - 5:47 p.m.



     LEWIS BRISBOIS BISGAARD & SMITH LLP
     110 Southeast Sixth Street, Suite 2600
        Fort Lauderdale, Florida 33301



          Stenographically Reported By:
               GISELLE ZAPATA

Julie Turnbull
January 31, 2024

1              You were looking for an opportunity to be able to

2    work with other limited partners to find solutions to the

3    failure of the borrower to repay?

4        A.   If that's what we had known at the time, I certainly

5    would have liked an opportunity to assess, be informed, and be

6    part of any decisions thereof.

7        Q.   And were you interested in investing more money in

8    the project?

9        A.   That would have depended on circumstances.  I mean,

10   I would have liked to have protected my initial investment.

11       Q.   Right.  The $500,000?

12       A.   Yes.

13       Q.   Right.  And I think you said you were getting a rate

14   of return of one percent?

15       A.   Mm-hmm.

16       Q.   Do you know how much of the partnership CMB Export

17   owned?

18       A.   I do not, but I know it was significantly more than

19   one percent.

20       Q.   All right.  Is a breach of fiduciary duty one of the

21   claims that was brought by the limited partners?

22       A.   I believe so.

23       Q.   Okay.  Can you describe for me what you believe

24   that -- what duty was breached by CMB?

25       A.   I don't believe CMB was fair to the investors, the

Julie Turnbull
January 31, 2024

1    initial investors.

2         Q.   Why not?

3         A.   Because of lack of disclosure.

4         Q.   So had they disclosed timely what -- let me backup.

5              What information did you want to know that was not

6    disclosed?

7         A.   I wouldn't have known at the time.

8         Q.   Today what -- when you're looking back on it, you're

9    saying, well, they didn't give me all the information I think

10   I should have, right?

11        A.   Yes.

12        Q.   What information would you have been seeking from

13   CMB?

14        A.   A truthful explanation.  The project eventually

15   needed loans and additional funds.

16        Q.   And if that -- if CMB provided that information,

17   then you would have been satisfied?

18        A.   I can only say I would assume so.

19        Q.   I understand that you made a $500,000 initial

20   investment, right?

21        A.   Yes.

22        Q.   Outside of that investment, have you been

23   financially harmed?

24        A.   In what respect?

25        Q.   Well, can you articulate for me how you've been

Julie Turnbull
January 31, 2024

```
 1   harmed by virtue of the conduct that you claim CMB engaged in?

 2       A.   Well, initially we now know that the $500,000 is in

 3   jeopardy, we were not given an opportunity to renegotiate or

 4   collaborate or just to be part of any solution, so I believe

 5   we were harmed.

 6       Q.   Okay.  In terms of -- are you seeking money in this

 7   case?

 8       A.   I hope so.

 9       Q.   Okay.  And what -- what money are you seeking?

10       A.   Our attorneys have hired an expert to assess

11   potentially our damages.

12       Q.   Okay.  As you sit here today, can you explain to me

13   how you've been financially harmed?

14       A.   Well, I believe through the lack of communication

15   and transparency.  I had no say to be part of any potential

16   solution.

17       Q.   Okay.  But what dollars have been lost?

18       A.   For me?

19       Q.   By you?

20       A.   Well, $500,000, plus any interest.

21       Q.   Okay.  So you made the initial investment $500,000.

22   You understand that was at risk, right?

23       A.   I did not at the time, no.

24       Q.   Oh, you didn't understand that there was risk

25   associated with making the $500,000 investment?
```

Julie Turnbull
January 31, 2024

1        A.    My attorney -- bearing in mind my husband was

2    terminally ill.  I mean, of course, they -- attorney-client

3    privilege, but my attorney was very confident that he had

4    found a wonderful, safe project with a company that had a

5    great track record.

6        Q.    Okay.  Now, that -- your initial investment, the

7    $500,000 alone with the other limited partners was pooled

8    together, we went over this, it was loaned to BrightSource,

9    right?

10       A.    Yes.

11       Q.    Okay.  Do you know whether the solar plant was

12   built?

13       A.    I do not.

14       Q.    Do you have any idea what its operational capacity

15   is today?

16       A.    I do not.

17       Q.    All right.  Now, you said you have your principal

18   investment of $500,000 that was loaned out.

19            You don't know why that was not recovered, right?

20       A.    Okay.

21       Q.    Is that correct?  I don't want to put words in your

22   mouth.  You told me earlier that you're not sure why that

23   money was not repaid.

24       A.    Okay.

25       Q.    Is that correct?

Julie Turnbull
January 31, 2024

```
 1      A.   I believe so.

 2      Q.   Well, I'll just ask you straightforward.

 3      A.   Okay.  Thank you.

 4      Q.   Do you know why BrightSource has not repaid the

 5  $90 million loan that was made by the limited partnership?

 6           MR. GAW:  Objection.  Calls for speculation.

 7  BY MR. JOYCE:

 8      Q.   Do you have any understanding as to why?

 9      A.   I'll refer to my attorney.

10      Q.   Well, he's making an objection, but you still have

11  to answer the question.

12      A.   Oh.  I'm not sure.

13      Q.   Okay.  So just so we're all on the same page, I just

14  want to make sure the question and answer came out, okay?

15      A.   Okay.

16      Q.   Today you're not aware of why BrightSource has not

17  repaid the $90 million loan?

18      A.   I'm unclear.

19      Q.   Do you believe the general partners are continuing

20  to cause you harm to this day?

21      A.   Sorry.  Can you explain?

22      Q.   Do you believe that the partner -- general partner,

23  CMB Export is continuing to cause you harm?

24      A.   I am still -- I'm still harmed financially.

25      Q.   By losing your -- the $500,000 initial investment?
```

1    A.   Yes, because --

2    Q.   And then you also mentioned interest, I think,

3  right?

4    A.   Yes.  I believe if we had been given an opportunity

5  to cut our losses at various stages, which we wouldn't have

6  known at the time, that would have been helpful.

7    Q.   How much interest were you seeking to obtain?

8    A.   I believe, without being 100 percent sure, our

9  interest throughout the scheme was one percent.

10    Q.   Besides the monetary damage, are you seeking any

11  other relief from the court?

12    A.   I'd have to refer to our expert at this point.

13    Q.   As you sit here today though, you're not certain

14  whether you're seeking anything else besides money?

15    A.   That's something that I would prefer to discuss with

16  my legal team.

17    Q.   I'm not asking about what you and your legal team

18  are going to discuss or may discuss.  I just want to know what

19  you know today.

20       Are you familiar with anything else that you're

21  seeking in this lawsuit besides money?

22    A.   I'm unsure.

23    Q.   Do you know as a limited partner in Group VII, do

24  you have any obligation to repay any of the debts or

25  obligations of the partnership?

1      A.    Not that I'm aware.

2      Q.    Do you know who is responsible for paying those

3   debts and obligations?

4      A.    I'm not sure.  Sorry.

5      Q.    Have you suffered any adverse tax consequences as a

6   result of your investment in Group VII?

7      A.    I'm unclear.

8      Q.    Do you know if you've sought to offset any gains

9   that you've made with any of the losses accrued in your Group

10  VII investment?

11     A.    I'm currently not.

12     Q.    Is it possible you're contemplating that?

13     A.    Depending on the outcome.

14     Q.    So you know as you sit here today with regard to

15  your tax return, you have not sought to off -- offset any

16  gains with the loss from this Group VII partnership?

17     A.    I believe not currently.

18     Q.    And who does your tax returns?

19     A.    I have an accountant.

20     Q.    What is the accountant's names?

21     A.    Eric Hawks.

22     Q.    Can you spell that last name?

23     A.    H-a-w-k-s.

24     Q.    So if you do have an adverse tax consequence as a

25  result of your investment in Group VII, is it possible that

Julie Turnbull
January 31, 2024

1    Q.   So you don't recall seeing any documentation to that

2    effect?

3    A.   I don't.

4    Q.   Do you know if any documentation exists to that

5    effect?

6    A.   I don't.

7    Q.   Okay.  Can you look at number 15 for me.  It's on

8    page 14.

9    A.   14?

10   Q.   14.  This asks you to explain the way a defendant

11   negotiated away the limited partners rights in connection with

12   the loan modification.

13        You see that?

14   A.   I do.

15   Q.   How did CMB negotiate away the limited partners

16   rights?

17   A.   I believe through withholding information.

18   Q.   Was there a negotiation?

19   A.   Information.  Sorry.

20   Q.   Okay.  Withholding information?

21   A.   Mm-hmm.

22   Q.   How did that affect the limited partners rights?

23   A.   I think with hindsight -- I think the principal of

24   the arrangement and the agreement changed, and my opinion

25   could have potentially been rediscussed or renegotiated.

Julie Turnbull
January 31, 2024

```
 1       Q.   Have you had any discussion with any experts that
 2   were retained by the plaintiffs in this case?
 3       A.   Not yet.  I mean, of course, an attorney is an
 4   expert.
 5       Q.   Yeah.  An independent expert --
 6       A.   No.
 7       Q.   -- retained by -- doesn't have to be retained, but
 8   an independent --
 9       A.   No.
10       Q.   -- expert that would opine about position in this
11   case?
12       A.   No.
13       Q.   Have you attempted to undertake any damage
14   analysis --
15       A.   No.
16       Q.   -- associated in this -- with this case?
17       A.   No.
18       Q.   Can you look at 18 for me.
19       A.   Page 18?
20       Q.   Interrogatory number 18.  That's on page 17.
21       A.   Okay.
22       Q.   It asks:  "Have you identified all tax consequences
23   experienced by you as a result of defendant's alleged conduct
24   as set forth in paragraph 101 the first amended complaint."
25   And then you responded -- I'm looking at line 18.
```

Julie Turnbull
January 31, 2024

1            "Plaintiff will provide detailed information

2    regarding tax consequences through expert witness.  Plaintiff

3    may supplement this interrogatory response as appropriate

4    after discovery is substantially complete."

5            So my question with regard to this is have you

6    identified any adverse tax consequences that you've

7    experienced?

8        A.   I have not.

9        Q.   Have you spoken to any of your financial advisors,

10   accountants, tax preparers regarding potential tax

11   consequences associated with your investment in Group VII?

12       A.   Not yet.

13       Q.   Do you intend to have that conversation?

14       A.   I would imagine so.

15       Q.   If there's an advantage to taking a deduction based

16   on this loss, is that your intent to do so?

17       A.   I don't understand the process of yet.

18       Q.   Have you provided any information to your financial

19   advisors associated with the Group VII investment?

20       A.   Not yet.

21       Q.   Do you plan to do that shortly or you haven't set a

22   time yet?

23       A.   I haven't set a time.

24       Q.   And if you -- if there is an advantage to recording

25   the losses that you've experienced, do you intend to do that

Julie Turnbull
January 31, 2024

1   on your tax return?

2       A.   I couldn't say.

3       Q.   What information do you need to know?

4       A.   I need to have a conversation and then let them do

5   their thing.

6       Q.   With your professional advisors?

7       A.   Yes.

8       Q.   But you're not agreeing to waive that today as you

9   sit here right now?

10      A.   Waive what?  Sorry.

11      Q.   Waive any potential advantageous tax position that

12  you may be able to achieve by recognizing the losses in this

13  Group VII case?

14           MR. GAW:  Objection.  Vague.

15           THE WITNESS:  I don't really understand what you

16      mean.

17  BY MR. JOYCE:

18      Q.   Okay.  So if there's -- if you have the ability to

19  offset gains with the loss that you incurred in Group VII,

20  understanding you haven't made that decision yet, but you're

21  not agreeing to waive that, in other words, you may want to

22  use it in the future, right?

23           MR. GAW:  Objection.  Vague.

24           THE WITNESS:  I couldn't say.

25  BY MR. JOYCE:

Julie Turnbull
January 31, 2024

1      Q.   So you don't know whether you're waiving that right
2  or not?
3      A.   No, I don't.
4      Q.   You don't know?
5      A.   I don't know.
6      Q.   Okay.  Do you want to maintain your rights to do
7  that?
8      A.   I'd have to seek advice from counsel, I'm afraid.
9           MR. JOYCE:  Okay.  We're done.  Thank you.
10          MR. GAW:  I have a very short redirect, so you are
11     not quite off the hook yet.  Before we go, does anyone
12     need a short break?  Okay.
13                    CROSS-EXAMINATION
14 BY MR. GAW:
15     Q.   Ms. Turnbull, I realize you've been talking for a
16 long time.  I'll be quick.
17          Are you a lawyer, Ms. Turnbull?
18     A.   I am not.
19     Q.   Do you have any legal training?
20     A.   I do not.
21     Q.   Do you understand the meaning of words like amended
22 complaint or motion when those words are used in reference to
23 legal documents?
24     A.   I'm ashamed to admit only through TV, so it would be
25 a best guess.

Julie Turnbull
January 31, 2024

1    Q.   Okay.  I'm going to ask you to look at one of the

2    very first documents that was shown to you today.  It was

3    marked as Exhibit 36, and the title of the document is Amend

4    Complaint.

5    A.   36?

6    Q.   36.  Do you see Exhibit 36 there?

7    A.   I do.

8    Q.   If I were to characterize that document as the

9    document laying out the claims being brought by the plaintiffs

10   against CMB in this lawsuit, would that refresh your memory as

11   whether you've previously seen that document prior to today?

12   A.   Sorry.  Could you repeat that?

13   Q.   If I were you tell you that Exhibit 36 is the

14   document that lays out the claims brought by the plaintiffs in

15   this lawsuit --

16   A.   Yes.

17   Q.   -- would that refresh your memory as to whether or

18   not you have seen this document prior to today?

19        MR. JOYCE:  Objection.  Lack of foundation.

20        THE WITNESS:  I believe so.

21   BY MR. GAW:

22   Q.   Okay.  You believe you have seen the document laying

23   out the claims brought by the plaintiffs against CMB?

24   A.   I believe I have.

25   Q.   Okay.  You reviewed that document in connection with

Yun Xue
January 24, 2024

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


HUI CAI, et al.                    )
                                   )
              Plaintiffs,          )
                                   )
         vs.                       )   No. 2:22-CV-02025
                                   )        MWF (JPR)
CMB EXPORT LLC,                    )
                                   )
              Defendant.           )
_____)


VIDEOTAPED DEPOSITION OF

YUN XUE

LOS ANGELES, CALIFORNIA

JANUARY 24, 2024


Reported by:
Susan Myong
CSR 13365
No. 6524426-001

Yun Xue
January 24, 2024

1    what you discussed with your attorney because that's

2    privileged.  Okay?

3        A.    Okay.

4        Q.    So just be cognizant of that.

5        A.    Okay.  So we are informed we need class

6    representative to attend this kind of events in L.A.

7    And since I live in Orange County, I'm the -- one of

8    the plaintiffs that, you know, it will be more

9    convenient for me to travel here in person.

10       Q.    Uh-huh.

11       A.    So I volunteered.  So that's what I

12   discussed with Na Li.

13       Q.    Okay.

14       A.    Yeah.

15       Q.    So Nah -- just want to make sure I

16   understand.  Na Li asked you if you would be a class

17   representative?

18       A.    She asked if I want to volunteer to be the

19   class representative since I live in Orange County,

20   which is very close to L.A.

21       Q.    Uh-huh.

22       A.    So I said, yes, of course.  Yeah.

23       Q.    And did you have any other discussion with

24   Na Li about what your responsibilities would be as a

25   class representative?

Yun Xue
January 24, 2024

```
 1        A.    No.

 2        Q.    So as far as your understanding was, it's

 3   solely based upon your geographical location.

 4        A.    Yeah, that's one of the most important

 5   reason.  Another is that I want to contribute a

 6   little bit, whatever I can.

 7        Q.    Okay.

 8        A.    Yeah.

 9        Q.    You want to contribute to a successful

10   outcome?

11        A.    Yes.

12        Q.    Okay.  And what are you seeking in this

13   case?

14        A.    So we found out that CMB modified our loan

15   to --

16        Q.    Just want to make sure I understood.  You

17   said modified?

18        A.    Modified.  Yes.

19        Q.    Okay.

20        A.    Modified our loan terms to Bright Source as

21   well as the Hogan Family Trust made a bridge loan to

22   Bright Source, which is prior to our loan for the

23   repayment.  That's the wrongdoing I'm suing.

24        Q.    What are you asking from the court?  What

25   do you want to get?
```

Yang Xue
January 24, 2024

1        A.   So I think it's not fair that for CBM to

2   modify the loan terms without telling the limited

3   partners as well as the Hogan Family Trust that make

4   this bridge loan prior to our loan.  I hope that the

5   court will stop CMB and Hogan family from doing this

6   and help us limited partner -- help the limited

7   partners to cut the loss from this project.

8        Q.   Okay.  So let's just break that down for a

9   little bit.

10            You're claiming you suffered a monetary

11  loss?  You lost money?

12       A.   Yes.  Yes.

13       Q.   Okay.  So is your primary purpose in the

14  lawsuit to recover money that you're claiming was

15  lost?

16       A.   Can you rephrase the question?

17       Q.   Yeah.  So what I'm trying to get to is, you

18  know, ultimately what do you want from the court.

19            And you're telling me that you suffered a

20  financial loss; right?

21       A.   Yes.

22       Q.   And so my question is:  Is that what you're

23  asking from the court, to recover -- primarily

24  recover your loss?

25       A.   Yes.

Yun Xue
January 24, 2024

1      Q.   You want money, in other words.  More

2   simply.

3      A.   Or cut the loss.

4      Q.   Or -- okay.  Or stem the loss?

5      A.   Yeah.

6      Q.   Cut -- okay.

7      A.   Cut the loss.

8      Q.   Okay.  Now, you said that CMB modified the

9   loan documents.

10      A.   Yes.

11      Q.   Which loan documents are you referring to?

12      A.   The loan that limited partners made to

13   Bright Source.

14      Q.   Okay.  So the Group VII's loan, the

15   $90 million loan?

16      A.   Yes.

17      Q.   Okay.  That was made to Bright Source.

18      A.   Yes.

19      Q.   You're saying that CMB modified that --

20   terms of that loan.

21      A.   Yes.

22      Q.   And you don't think they should have.

23      A.   Right.

24      Q.   Okay.

25      A.   I don't think they should have.

Yun Xue
January 24, 2024

```
1        Q.   All right.  And how did they -- do you
2   recall how they modified the loan?  What changed?
3        A.   So CMB made a bridge loan to the limited
4   partners without telling us.
5        Q.   CMB the partnership?
6        A.   Yes.
7        Q.   Or, I'm sorry, CMB the general partner --
8        A.   Yes.
9        Q.   -- made a loan to Group VII?
10       A.   Made a loan to Group VII, the limited
11   partners.  Yeah.
12       Q.   And why did they do that; do you know?
13       A.   So they can get the interest from Bright
14   Source instead of the limited partners get the
15   interest.
16       Q.   So general partners CMB changed the loan
17   terms on the $90 million note?
18       A.   Yes.
19       Q.   And they changed -- what changed was --
20   that's why I'm a little confused on your answer.
21   What changed?  From the original loan, what changed?
22   How was it modified?
23       A.   So CMB made the bridge loan to the limited
24   partners --
25       Q.   Uh-huh.
```